UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEFF JASO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CASCADIAN THERAPEUTICS, INC., CHRISTOPHER S. HENNEY, ROBERT W. AZELBY, GWEN A. FYFE, STEVEN P. JAMES, TED W. LOVE, SCOTT D. MYERS, DANIEL K. SPIEGELMAN SEATTLE GENETICS, INC., and VALLEY ACQUISITION SUB, INC.,<br><br>Defendants. | NO. 2:18-cv-00241<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on January 31, 2018 (the "Proposed Transaction"), pursuant to which Cascadian Therapeutics,

Inc. ("Cascadian" or the "Company") will be acquired by Seattle Genetics, Inc. ("Parent") and Valley Acquisition Sub, Inc. ("Merger Sub," and together with Parent, "Seattle Genetics").

2. On January 30, 2018, Cascadian's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Seattle Genetics. Pursuant to the terms of the Merger Agreement, Merger Sub commenced a tender offer, scheduled to expire on March 9, 2018, and shareholders of Cascadian will receive $10.00 in cash for each share of Cascadian common stock that they own.

3. On February 8, 2018, defendants filed a Schedule 14D-9 Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Cascadian common stock.

9. Defendant Cascadian is a Delaware corporation and maintains its principal executive offices at 3101 Western Avenue, Suite 600, Seattle, Washington 98121. Cascadian's common stock is traded on the NasdaqGS under the ticker symbol "CASC."

10. Defendant Christopher S. Henney ("Henney") has served as Chairman of the Board of Cascadian since September 2006.

11. Defendant Robert W. Azelby ("Azelby") has served as a director of Cascadian since April 2017.

12. Defendant Gwen A. Fyfe ("Fyfe") has served as a director Cascadian since January 2016.

13. Defendant Steven P. James ("James") has served as a director of Cascadian since February 2015.

14. Defendant Ted W. Love ("Love") has served as a director of Cascadian since September 2013.

15. Defendant Scott D. Myers ("Myers") has served as President, Chief Executive Officer ("CEO"), and a director of Cascadian since April 2016.

16. Defendant Daniel K. Spiegelman ("Spiegelman") has served as a director of Cascadian since June 2008.

17. The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18. Defendant Parent is a Delaware company and a party to the Merger Agreement.

19.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of the Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Cascadian (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable. As of January 30, 2018, there were approximately 50,618,832 shares of Cascadian common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26.     Defendants have acted, or refused to act, on grounds generally

CLASS ACTION COMPLAINT - 4

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

27. Cascadian is a clinical-stage biopharmaceutical company dedicated to developing and commercializing novel targeted compounds that have the potential to improve the lives and outcomes of cancer patients.

28. The Company's lead product candidate is tucatinib, an investigational, orally bioavailable, potent HER2-selective small molecule tyrosine kinase inhibitor ("TKI").

29. Cascadian is conducting a randomized, double-blind, placebo-controlled pivotal trial called HER2CLIMB, which is comparing tucatinib versus placebo in combination with capecitabine and trastuzumab in patients with locally advanced or metastatic HER2+ breast cancer with and without brain metastases.

30. The Company is also developing a Chk1 kinase inhibitor and an antibody against an immuno-oncology target known as TIGIT, both of which are currently in preclinical development.

31. On January 4, 2018, Cascadian announced an overview of recent progress for tucatinib, in addition to several anticipated key objectives for 2018.

32. The Company reported that, in December 2017, the Company reported results from a subgroup analysis from its two ongoing combination studies of tucatinib, which demonstrated prolonged progression-free survival benefit regardless of presence of brain metastases or patient characteristics. These results were presented at the 2017 San Antonio Breast Cancer Symposium.

33. Also in December 2017, the first patient was enrolled in the investigator-initiated Phase 1b/2 trial known as TULiP that is evaluating tucatinib in combination with an aromatase inhibitor and CDK4/6 agent for patients with hormone receptor-

positive and HER2-positive (HR+/HER2+) metastatic breast cancer. Based on the activity of tucatinib in combination with multiple agents in patients with brain metastases observed in prior studies, the trial will also include these patients.

34.     As of December 2017, the investigator-initiated open label Phase 2 study of tucatinib in combination with trastuzumab for patients with HER2+/RAS wild type metastatic colorectal cancer, known as MOUNTAINEER, was enrolling ahead of the lead investigator's anticipated timeline.

35.     The Company had also successfully manufactured sufficient supply of tucatinib to complete all currently ongoing trials, including HER2CLIMB.

36.     In December 2017, the European Medicines Agency ("EMA") granted a full product-specific waiver for the Pediatric Investigation Plan ("PIP"), which means the Company is exempt from any requirements to perform pediatric development of tucatinib for the treatment of HER2+ metastatic breast cancer.

37.     Also in December 2017, EMA's Scientific Advice Working Group provided guidance on the planned manufacturing program for tucatinib, to ensure that Cascadian's manufacturing plans will be acceptable for filing and commercial release in the EU.

38.     The Company announced that, during 2018, it plans to:

(i)     continue enrolling the HER2CLIMB randomized pivotal trial of tucatinib in locally advanced or metastatic HER2+ breast cancer with and without brain metastases and provide an update on planned enrollment completion as appropriate;

(ii)    publish data from two Phase 1b studies of tucatinib in combination with other approved agents in HER2+ breast cancer in peer-reviewed journals;

(iii)   report on early interim results from the investigator-initiated study of tucatinib in HER2+ amplified, metastatic colorectal cancer known as MOUNTAINEER;

    (iv) pursue PRIME (PRIority MEdicines) designation with the EMA for tucatinib for the treatment of patients with metastatic colorectal cancer;

    (v) complete manufacture of registration lots that will be used to support the planned filing of a New Drug Application, or NDA, for tucatinib;

    (vi) identify development partners for Chk1 and TIGIT preclinical programs; and

    (vii) explore potential ex-U.S. partnership opportunities for tucatinib to support development and commercialization in Europe and Asia and support funding of a U.S. launch.

  39. Nevertheless, on January 30, 2018, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired by Seattle Genetics.

  40. Pursuant to the terms of the Merger Agreement, shareholders of Cascadian will receive $10.00 in cash for each share of Cascadian common stock that they own.

  41. The press release announcing the Proposed Transaction stated, in relevant part:

> Seattle Genetics, Inc. (Nasdaq:SGEN) and Cascadian Therapeutics, Inc. (Nasdaq:CASC) today announced the signing of a definitive merger agreement under which Seattle Genetics has agreed to acquire Cascadian Therapeutics. Under the terms of the agreement, Seattle Genetics will pay $10.00 per share in cash, or approximately $614 million. The transaction was unanimously approved by the Boards of Directors of both companies. . . .
>
> Under the terms of the definitive merger agreement, Seattle Genetics will commence a tender offer on or about February 8, 2018 to acquire all of the outstanding shares of common stock of Cascadian Therapeutics for $10 per share in cash. This represents a 69 percent premium to the closing price of Cascadian Therapeutics' common stock on Tuesday, January 30, 2018, and a 139 percent premium to its 30-day volume weighted average stock price. The tender offer is subject to customary closing conditions, including the tender of at least a majority of the outstanding shares of Cascadian Therapeutics common stock (on a fully

diluted basis) and the expiration or early termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Following the closing of the tender offer, a wholly-owned subsidiary of Seattle Genetics will merge with and into Cascadian Therapeutics, with each share of Cascadian Therapeutics common stock that has not been tendered being converted into the right to receive the same $10 per share in cash offered in the tender offer. The transaction is anticipated to close in the first quarter of 2018.

In connection with the transaction, Seattle Genetics has secured a financing commitment in the amount of $400 million from Barclays and JPMorgan-Chase Bank. The balance of the consideration will be provided from cash on hand.

42.  The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Sections 5.6(a) and (e) of the Merger Agreement provide:

> (a) During the Pre-Closing Period, except as expressly permitted by Section 5.6(c), the Company shall not, and shall cause its Subsidiaries and their respective directors, officers, employees, investment bankers, financial advisors, attorneys, accountants, agents and other representatives (collectively, "Representatives") not to, directly or indirectly, (i) initiate, solicit, or knowingly encourage or knowingly facilitate (including through the furnishing of any nonpublic information) the submission or announcement of any Takeover Proposal or any inquiry, indication of interest, offer or proposal that would reasonably be expected to lead to a Takeover Proposal (a "Takeover Inquiry"); (ii) participate, engage in or continue any discussions or negotiations regarding, or furnish to any Person any information in connection with, or for the purpose of knowingly encouraging or knowingly facilitating a Takeover Proposal or Takeover Inquiry; (iii) waive, terminate, modify or fail to enforce any "standstill" or confidentiality obligation of any Person (other than any party hereto) with respect to the Company or any of its Subsidiaries; (iv) approve, endorse or recommend any Takeover Proposal or Takeover Inquiry (or resolve or publicly propose to do any of the foregoing); or (v) enter into any agreement, agreement in principle, letter of intent or similar document with respect to a Takeover Proposal or Takeover Inquiry (other than an Acceptable Confidentiality Agreement entered into in accordance with this Section 5.6) or accept any Takeover Proposal or Takeover Inquiry (or resolve or publicly propose to do any of the foregoing).

(e) The Company shall, and shall cause its Subsidiaries and Representatives, to, immediately cease and cause to be terminated any solicitation, discussions or negotiations with any Person (other than Parent) conducted on or prior to the date of this Agreement that relate to any Takeover Proposal or Takeover Inquiry or any request for nonpublic information relating to the Company with respect to any Takeover Proposal or Takeover Inquiry. The Company shall also immediately terminate all physical and electronic data room access previously granted to any such Person or any of its Representatives. Within 24 hours after executing this Agreement, the Company shall deliver a written notice to each such Person providing only that the Company is ending all discussions and negotiations with such Person with respect to any Takeover Proposal or Takeover Inquiry, which notice shall also request the return or destruction of all confidential information provided by or on behalf of the Company to any such Person or any of its Representatives promptly after the date of this Agreement.

43. Additionally, the Company must promptly advise Seattle Genetics of any proposals or inquiries received from other parties. Section 5.6(d) of the Merger Agreement states:

(d) During the Pre-Closing Period, the Company shall (1) promptly (and in any event within 24 hours) advise Parent in writing of the receipt of any Takeover Proposal or Takeover Inquiry that is made or submitted by any Person during the Pre-Closing Period, (2) provide to Parent a summary of the material terms and conditions thereof (including the identity of the Person making such Takeover Proposal or Takeover Inquiry and, if applicable, complete copies of any written request, inquiry, proposal, indication of interest or offer (or written summaries thereof if the same were made in oral form), including proposed agreements and any other written communications), (3) keep Parent reasonably informed of any material developments, discussions or negotiations regarding such Takeover Proposal or Takeover Inquiry (including any modifications to the financial or other material terms and conditions of such Takeover Proposal or Takeover Inquiry) on a prompt basis (and in any event within 24 hours), and (4) upon the request of Parent, reasonably inform Parent of the status of such Takeover Proposal or Takeover Inquiry.

44. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants Seattle Genetics a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.6(f) of the Merger Agreement states, in relevant part:

(ii) Notwithstanding anything to the contrary contained in Section 5.6(f)(i), at any time prior to, but not after, the Acceptance Time, if (I) the Company has received an unsolicited Takeover Proposal (which Takeover Proposal did not result from or arise out of a breach of this Section 5.6 in any material respect) from any Person that has not been withdrawn and, after consultation with outside legal counsel and the Company Financial Advisor, the Company Board has determined in good faith that such Takeover Proposal constitutes a Superior Proposal (after giving effect to all of the revisions to the terms of this Agreement which may be offered by Parent, including pursuant to clause (C) below) or (II) after consultation with outside legal counsel and the Company Financial Advisor, the Company Board has determined there has been an Intervening Event, then (x) the Company Board prior to the Acceptance Time may make a Company Adverse Change Recommendation or (y) in the case of a Company Adverse Change Recommendation relating to a Superior Proposal, and after complying with the provisions of this Section 5.6(f)(ii), the Company may terminate this Agreement in accordance with Section 7.1(d) in order to enter into a Specified Agreement with respect to such Superior Proposal, in the case of each of (I) and (II), if and only if: (A) the Company Board has determined in good faith, after consultation with outside legal counsel and the Company Financial Advisor, that the failure to do so would be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law; (B) the Company shall have given Parent prior written notice of its intention to make a Company Adverse Change Recommendation or terminate this Agreement pursuant to Section 7.1(d) at least four Business Days prior to making any such Company Adverse Change Recommendation or termination (a "Determination Notice"), which notice shall have included (1) with respect to an Intervening Event, a reasonably detailed description of the Intervening Event or (2) with respect to such Superior Proposal, a copy of the Specified Agreement, the identity of the Person making such Superior Proposal, and a summary of the material terms and conditions of such Superior Proposal; (C)(1) the Company shall have given Parent four Business Days after Parent's receipt of the Determination Notice to propose revisions to the terms of this Agreement or make other proposals so that either (aa) such Takeover Proposal would cease to constitute a Superior Proposal or (bb) in the case of a Company Adverse Change Recommendation involving an Intervening Event, such that the failure to effect a Company Adverse Change Recommendation would not be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law, and shall have made its Representatives available to, and negotiated in good faith with, Parent with respect to such proposed revisions or other proposals, if any, during such period, (2) at the end of such period, after considering in good faith the results of such negotiations and giving effect to such proposed revisions or other proposals made by Parent, if any, and after consultation with outside

legal counsel and the Company Financial Advisor, the Company Board shall have determined in good faith that such Takeover Proposal is still a Superior Proposal and, after consultation with outside legal counsel, that the failure to make such Company Adverse Change Recommendation or terminate this Agreement pursuant to Section 7.1(d) would be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law or, in the case of a Company Adverse Change Recommendation involving an Intervening Event, that the failure to effect a Company Adverse Change Recommendation would be inconsistent with the Company Board's fiduciary duties to the Company's stockholders under applicable Law. For the avoidance of doubt, the provisions of this Section 5.6(f)(ii) shall also apply to every amendment to any Takeover Proposal and shall require a new Determination Notice be delivered to Parent in accordance with clause (B) above, except that the "matching" period described in clauses (B) and (C) above shall be two Business Days rather than the initial four Business Day period.

45. The Merger Agreement also provides for a "termination fee" of $17 million payable by the Company to Seattle Genetics if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Solicitation Statement Omits Material Information, Rendering It False and Misleading***

46. On February 8, 2018, defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.

47. The Solicitation Statement omits material information regarding the Proposed Transaction, which renders the Solicitation Statement false and misleading.

48. First, the Solicitation Statement fails to disclose whether any non-disclosure agreements executed by the Company and the prospective bidders contained standstill and/or "don't ask, don't waive" provisions that are or were preventing those counterparties from submitting superior offers to acquire the Company.

49. Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

50.     Second, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

51.     Specifically, the Solicitation Statement fails to disclose the timing and nature of all communications regarding (1) future employment and directorship of the Company's officers and directors, (2) employment agreements, and (3) the payments of transaction bonuses and special committee payments, including who participated in all such communications.

52.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

53.     Third, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's financial advisor in connection with the Proposed Transaction, Perella Weinberg Partners LP ("Perella").

54.     Specifically, the Solicitation Statement fails to disclose the amount of Perella's fee that is contingent upon consummation of the Proposed Transaction.

55.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

56.     Fourth, the Solicitation Statement omits material information regarding the Company's financial projections and the valuation analyses performed by Perella.

57.     With respect to the Company's financial projections, the Solicitation Statement fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

58.     With respect to Perella's *Selected Publicly Traded Companies Analysis*, the Solicitation Statement fails to disclose the inputs and assumptions underlying the

fully diluted share count for each respective equity value in the analysis.

59. With respect to Perella's *Selected Transactions Analysis*, the Solicitation Statement fails to disclose Perella's basis for selecting the transactions it observed in the analysis.

60. With respect to Perella's *Premium Paid Analysis*, the Solicitation Statement fails to disclose the transactions observed by Perella in the analysis, as well as the premiums paid in such transactions.

61. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

62. The omission of the above-referenced material information renders the Solicitation Statement false and misleading, including the "Solicitation or Recommendation" section of the Solicitation Statement.

63. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**(Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)**

64. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

65. Section 14(e) of the 1934 Act states, in relevant part, that:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

66. Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary

to make the statements therein not misleading.

67. The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

68. The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

69. By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

70. The omissions in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available.

71. Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

72. By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

73. Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

74. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**(Claim for Violation of 14(d) of the 1934 Act Against Defendants)**

75. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76. Section 14(d)(4) of the 1934 Act states:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

77. Rule 14d-9(d) states, in relevant part:

> Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

78. The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

79. Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

80. The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

81. Plaintiff and the Class have no adequate remedy at law.

## COUNT III

**(Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Seattle Genetics)**

82. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

83. The Individual Defendants and Seattle Genetics acted as controlling

persons of Cascadian within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Cascadian and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

84. Each of the Individual Defendants and Seattle Genetics was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

85. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly connected with and involved in the making of the Solicitation Statement.

86. Seattle Genetics also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

87. By virtue of the foregoing, the Individual Defendants and Seattle Genetics violated Section 20(a) of the 1934 Act.

88. As set forth above, the Individual Defendants and Seattle Genetics had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the 1934 Act and Rule 14a-9, by their acts and omissions as

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

89. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

90. Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A. Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED this 14th day of February, 2018.

BRESKIN JOHNSON & TOWNSEND, PLLC

By: */s/ Roger Townsend*
Roger Townsend, WSBA # 25525
1000 Second Avenue, Suite 3670
Seattle, Washington 98104
206-652-8660 Phone
206-652-8290 Fax
rtownsend@bjtlegal.com

*Attorneys for Plaintiff*

OF COUNSEL:

RIGRODSKY & LONG, P.A.
300 Delaware Avenue
Suite 1220
Wilmington, DE 19801
302-295-5310

RM LAW, P.C.
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
484-324-6800